HON. ASAHEL PECK,  
HON. HOYT H. WHEELER, } ASSISTANT JUDGES.  
HON. JONATHAN ROSS,

---

## ABRAHAM ADAMS, ADMINISTRATOR OF CHARLES W. CHANDLER, *v.* SEWALL FULLAM.

*Evidence. Title. Verbal Contract. Sale of Land. Adverse Possession. Jury.*

The county court having directed a verdict for the defendant, if the evidence had no such tendency to show a right of recovery against the defendant as would in law justify a jury in finding a verdict for the plaintiff, the ruling of the county court was right; otherwise it was wrong.

C., the plaintiff's intestate, who died in 1853, took a deed of the land in question in 1814, but did not go into possession of the same prior to a verbal contract of sale by him to A. in 1836 or 1837. A. having been in possession of the land under said contract until 1850, when he surrendered it to C., the plaintiff can recover the same against this defendant, who claims it under A., having levied an execution in his favor against A. on the same in 1856, unless A. gained a legal title thereto against C. by fifteen years continuous adverse possession while occupying under the verbal contract.

Adams, administrator, v. Fullam.

The testimony having left it doubtful whether A.'s possession commenced in 1836 or 1837, it was a question for the jury whether A. was in possession fifteen years prior to his surrender to C.

It was also a question for the jury, upon the evidence, whether A.'s possession was exclusive of that of C.

It was error for the court to assume that the possession of A. was adverse to C., so that a continuance of it for fifteen years would gain title against C.

If the purchaser of land by verbal contract pay the stipulated price and go into possession of the same as owner, and continue the possession as such owner for fifteen years, his title will thereby become perfect. But if, on the contrary, by the contract of purchase he is to have the premises if he pays the price, and never complies with the condition, his possession of the premises under such contract is not of such an adverse character as to ripen into a title, as against the vendor, in fifteen years.

If A., at the time the verbal contract was given up, had not acquired a legal title as against C., it was competent for A. and C., by verbal agreement, to give up the contract of purchase, and A.'s possession would enure to the benefit of C.

EJECTMENT for Lot No. 9 in the 9th range of lots in Weston. Plea, general issue, and trial by jury at the December term, A. D., 1868, BARRETT, J., presiding.

On trial, the plaintiff gave in evidence letters of administration upon the estate of his intestate, duly issued by the probate court for the district of Windsor, and dated February 10, 1853. Also, a quitclaim deed from Edward Simons to his intestate, Dr. Charles W. Chandler, of the demanded premises, dated April 14, 1814, duly acknowledged and recorded April 18th, 1814.

Also, the depositions of John Adams, Anson Graham, and Betsey D. Peabody, extracts from which are hereafter set forth.

The plaintiff was called as a witness, and testified that he married Dr. Chandler's daughter in the fall of 1830; that he (witness) then lived in Andover; that he moved to Ludlow in April, 1831; that from 1830 to 1838 he was at Dr. Chandler's every year; that he knew that Dr. Chandler had this mountain lot as far back as 1825; that he (witness) had cattle pastured in that lot in 1838, by arrangement with Dr. Chandler; that a short time before Dr. Chandler's sickness in 1849, he was at Chandler's once when John Adams was there, and that John Adams then told Dr. Chandler that he was embarrassed and could not carry out the trade, and better give it up; that after Dr. Chandler's sickness in 1849, witness had charge of his business, and, at his request, told John Adams that Dr. Chandler wanted to have the matter in respect to the mountain lot closed up; that Dr. Chandler removed to witness's house in Ludlow, in 1851, and died there January 9,

1853 ; and that in the summer of 1853 the witness as administrator went upon this lot of land with the appraisers and had it appraised as part of the estate of his intestate.

The plaintiff also gave in evidence a copy of the appraisal of Dr. Chandler's estate, from which it appeared that this lot of land was entered thereon and appraised as part of the estate ; also, a copy of an execution in favor of the defendant against John Adams, and the levy thereon,—from which it appeared that the defendant levied upon said lot of land, as the property of John Adams, November 20, 1856.

The plaintiff also gave evidence tending to prove that defendant had since been in possession of the premises, and had cut and taken timber and wood therefrom, and the amount and value thereof. The plaintiff then rested his case. No testimony was introduced by the defendant.

Upon this testimony the defendant insisted, and the court decided, as matter of law, that the plaintiff had not shown that his intestate, Dr. Chandler, had title to the land in question at the time of his decease, but that the same was in John Adams ; and thereupon the court directed the jury to return a verdict for the defendant. To which decision and direction the plaintiff excepted.

### EXTRACTS FROM DEPOSITIONS.

*John Adams.* " In the year 1836 or 1837, I think, I made a verbal contract with Dr. Charles W. Chandler, to buy a hundred acres of land in Weston, about twenty of which was then cleared. It was bounded east by Andover line, south by land of Jerry Adams, and north by land of one Wilson. I suppose it is the same land in controversy between said Chandler's estate and Sewall Fullam of Ludlow.

I think I did not turn in cattle after 1847, or 1848 ; I can't say which ; the pasture had run up to brush, so it would not pay to mend the fence. I think I occupied the pasture more or less every year from the time I contracted for it, to the years of 1847 or 1848, except 1838. I had not stock enough to stock the pasture every year, and the said Chandler used to turn in more or less occasionally. I was to pay two dollars per acre for the lot, if I had it. I built some fifty rods of wall on the south line, or more ; I am not certain how much.

It is some fifteen or twenty years since I have been on the land. I paid the taxes on the land up to fifty or fifty-one ; the last tax I paid was to Wallace ; it was twenty-five cents ; I am not positive ; I objected to paying the tax, because the trade had fallen through.

The said Chandler was to take of me a piece of mowing land, in part pay for said lot, lying east of it, in Andover. It lay nearer to said Chandler's home farm, and he mowed it two years. I don't know as he mowed it any more or not. The said Chandler turned in cattle occasionally, after mowing it, for several years. I had a number of talks with said Chandler about giving up the contract in the years of 1846, 1847, or 1848. I told him I should not be able to pay him for it. We never had any writings made about the land, any way. I owed said Chandler at the time we had this talk, borrowed money ; I never paid any thing to the said Chandler toward the land. I had borrowed some gold of said Chandler, and when I paid him that, I told him that was all I could ever pay him, and closed up our deal.

Question by defendant. Did you not, from the time you made said contract until 1851, call that land your own and treat it as your own ? Ans. No, I did not.

Ques. by same. How came Dr. Chandler to occupy the land in 1838 ? Ans. I had nothing to turn in, and did not want it that season and let him have it.

Ques. by plaintiff. Did you ever yourself, or any one by your direction, do any thing, or claim any possession after 1848 ? (Objected to by defendant.) Ans. No, never to my recollection."

*Anson Graham.* "I am fifty-seven years of age, and in the spring of 1837 I commenced work for Dr. C. W. Chandler, in Andover, and worked for him until 1851, with the exception of two or three years ; and during this time I had the management of the said Chandler's farming business, under the directions of said Chandler ; and for several years, when I first worked for said Chandler, he (Chandler) occupied a pasture, adjoining said pasture in Weston, in Andover, which belonged to said John Adams, by turning in cattle ; and one year he mowed part of it ; and said Chandler turned into the mountain pasture in Weston cattle and colts occasionally every year while I worked for him, as long as the pasture was occupied by any one ; in 1848, Chandler turned cattle into the mountain pasture, and not after that, nor any one else. In the year of 1838, Abram Adams had the use of the mountain pasture, and I had charge of salting and looking after his cattle ; there were no cattle but Abram Adams's in the pasture that year, except a few that Chandler turned in.

Ques. by defendant. Did you ever hear Chandler speak of

Adams having made payments towards the pasture ?    Ans.    I heard him say that Adams had never paid anything towards the pasture, and he had no deed of it, and he should have to take it back.

Ques. by same.   Did not John Adams have his own cattle in the mountain pasture in Weston every year, while you lived with Dr. Chandler, or nearly so ?    Ans.   He had cattle or horses in every year but one, while the pasture was occupied by any one."

*Betsey D. Peabody.*   " I resided at Dr. Charles W. Chandler's, in Andover, from the year 1842 to 1851.   I took charge of the domestic affairs of Dr. Chandler, and kept his house during that period.   Dr. Chandler had a shock of palsy in A. D., 1849, and he was not able to do much business after that ; and when his assistant was not there, I sometimes settled Dr. Chandler's accounts with his customers, and took money on notes when his debtors called to pay him.

I was present when John Adams, of Andover, came to do some business with Dr. Chandler ; this was in the year A. D. 1850, I think.   Mr. Adams came to pay Dr. Chandler some borrowed money ; he paid the Dr. the borrowed money, which was forty dollars, in gold.   They also had some other business concerning a pasture, or mountain lot, so called, lying in Weston, in said county.   Mr. Adams then told Dr. Chandler that he had become embarrassed and could not pay for said pasture, or mountain lot, and that he, Dr. Chandler, would have to take it back.   The Dr. consented to release Mr. Adams from any contract they had relative to the same, and it was agreed that Mr. Adams should give in all the claims he had against Dr. Chandler for the use of another lot, which the Dr. had occupied, and that Mr. Adams should charge nothing for the wall he had laid on the lot, and the whole contract should be given up, and the said mountain lot, or pasture, should remain the property of Dr. Chandler, and that Mr. Adams should have no further claim upon said mountain lot, or pasture. The Doctor and Mr. Adams talked the subject over fully in my presence, and came to the agreement as above set forth.   I saw no papers passed between them, and I understood from their con versation, that there never had been any writing between the parties relative to said lot.    The above is the substance of the conversation as it took place ; but I cannot now give the words of the conversation, except as above stated."

*F. C. Robbins* and *Washburn & Marsh,* for the plaintiff.

A person who is in possession of lands, under a parol contract of purchase, is only tenant at will ; consequently the possession

of John Adams enured to the benefit of Chandler and his representatives, and " constitutes a possession in them ; for, until the actual conveyance, the vendee of land stands in the relation of tenant, or *quasi* tenant, to the vendor." *Spear* v. *Burk*, 14 Vt., 404 ; 4 Met., 224 ; 1 Washburn on Real Property, 389 ; 12 Mass., 325 ; 9 Vt., 37 ; 10 Ib., 593 ; 18 Ib., 220 ; 36 Ib., 69 ; 8 M. & W., 118 ; 5 Ib., 14 ; .24 E. C. L., 470 ; 30 N. H., 538 ; 7 Cowan, 747.

*Sewall Fullam, pro se.*

Adams's possession was not the possession of Chandler. It was under and adverse to him, and cannot enure to his benefit. And without this, Chandler's possession fell far short of fifteen years. An estate obtained by possession cannot pass by a verbal surrender. *Austin* v. *Bailey*, 37 Vt., 219.

The opinion of the court was delivered by

Peck, J. Upon the plaintiff's evidence, without any evidence on the part of the defense, the county court decided, as matter of law, that the plaintiff had not shown that his intestate, Chandler, had title to the land in question at his decease, but that the same was in John Adams, and thereupon directed a verdict for the defendant. If the evidence had no such tendency to show a right of recovery against the defendant as would in law justify a jury in finding a verdict for the plaintiff, the ruling of the county court was right ; otherwise it was wrong.

It appears that the defendant levied an execution on the premises in 1856, in his favor, against John Adams, and subsequently entered into possession. According to the evidence, Chandler took a deed of the lot in 1814, and never executed any conveyance of it ; but that of itself did not show title in him, as no title or possession was shown in his grantor ; and the evidence fails to show any possession by Chandler previous to the verbal contract of sale by him to John Adams in 1836 or 1837. But as John Adams never had a deed of the lot from Chandler, and his verbal agreement of purchase was, by mutual agreement between him and Chandler, given up and abandoned, and the possession under

it by Adams surrendered up to Chandler in 1850, it is evident
that Chandler or his representative could recover against this de-
fendant who claims under John Adams, unless Adams gained a
legal title as against Chandler by fifteen years adverse continuous
possession while in possession under that verbal contract of pur-
chase.   While the testimony left it doubtful whether John Adams's
possession commenced in 1836 or in 1837, it was at least a ques-
tion for the jury, whether John Adams was in possession fifteen
years prior to his surrender of possession and all claim under his
contract of purchase.   Again, it was a question for the jury upon
the evidence, whether John Adams's possession was exclusive of
that of Chandler.   And most clearly it was error to assume as
matter of law that the possession of Adams was adverse to Chan-
dler, so that a continuance of it for fifteen years would gain title
against Chandler.   A purchaser of real estate by verbal contract
may occupy it under such circumstances as to acquire the title
from the vendor by fifteen years possession.   For instance, if he
purchase and pay the stipulated price, and go into possession as
the present absolute owner in pursuance of such purchase, and
continue the possession as such owner under such claim for fifteen
years, his title would thereby be perfected.   But on the contrary,
if by the contract of purchase he is to have the premises if he
pays the price, and never complies with the condition, a posses-
sion for fifteen years by the purchaser under such contract would
not be of such an adverse character as would ripen into a title
against the vendor by fifteen years possession, unless something
further were shown.   The testimony to the effect that by that ver-
bal contract Adams was to pay two dollars per acre for the lot,
*if he had it;* the conversation between Chandler and Adams in
1846, 1847 and 1848, as to Adams giving up the lot; Adams
telling Chandler he should not be able to pay him for it, and the
fact that he never did pay anything for it; his taking back and
disposing of the piece of mowing land that Chandler, by the ver-
bal contract, was to have in part payment, but which was never
deeded to Chandler; that Adams ultimately in 1850 gave up the
lot as already stated, from his inability to pay for it; together
with other evidence in the case of a similar character, tends to

the conclusion that Adams never claimed to own the lot except upon the contingency of his paying for it, which payment he never made, and never claimed to have made. If so, the possession by John Adams was not of a character to ripen into a title against Chandler, even if continued during the statutory period of fifteen years. If John Adams, at the time the contract of purchase was given up, had not acquired a legal title as against Chandler, it was competent for them by verbal agreement to give up that contract of purchase, and Adams's possession would enure to the benefit of Chandler. Upon this hypothesis, when the defendant in 1856 levied his execution upon the lot in question as the property of Adams, Adams had no right or title, either inchoate or perfect, upon which the levy could operate. The evidence tended to show title in Chandler; and most clearly it tended to show that the defendant claimed under Chandler's title through John Adams, and that John Adams never acquired Chandler's title; and this tends to prove such a title or right in the plaintiff as is sufficient to warrant a recovery against this defendant.

Judgment reversed, and new trial granted.